In the Matter of the Accounting of LOTTIE POLSKY, as Executrix of MAY ROBBINS LEVY, Also Known as MAY R. LEVY and MAY LEVY, Deceased, Respondent. PATRICIA B. LEVY, Appellant.

In the Matter of the Accounting of LOTTIE POLSKY, as Testamentary Guardian of PATRICIA B. LEVY, Respondent. PATRICIA B. LEVY, Appellant.

First Department, November 7, 1963.

*Stephen A. Wise* for appellant.

*Julius C. Levy* for respondent.

BREITEL, J. P. Patricia Levy appeals from orders denying her applications to reopen final accountings in a decedent's estate and in a guardianship on the grounds of fraud and " collusion ". In connection with both accountings appellant had signed waivers of citation shortly after reaching her majority in 1959.

The present proceedings were initiated more than three years later.

It is very rare that circumstances suffice to permit the reopening of final decrees, especially when the decrees are supported by waivers of citation executed by a competent person. Here there are circumstances, however, which warrant at least a hearing. This is because of the multiple fiduciary relationships among appellant, her aunt, and the lawyer for the aunt, the events in obtaining of the waivers of citation, the obvious errors, and the disproportionate cost of administration in both accountings. Consequently, the orders should be reversed and the proceedings remanded to the Surrogate for the taking of appropriate proof, and determining whether any relief is warranted.

Taking the basic and thus far uncontradicted facts in the petition, the following occurred: Miss Levy's mother died November 25, 1958. Decedent's daughter was not to be 21 until September 8, 1959, 10 months later. In round figures, the mother left assets of $45,000, only $19,000 of which belonged properly to her estate. There were $26,000 in savings bank accounts in the name of the mother and daughter jointly, with right of survivorship in the daughter. There were, among the $19,000, savings bonds of just under $7,000 and New York Stock Exchange listed stocks of $12,000. The only debts, which were paid without difficulty or dispute, totalled approximately $600. Estate taxes of $352 were paid. Despite the simplicity and liquidity of the decedent's estate, the immediately available status of the joint bank accounts, and the impending majority of the sole distributee, legal fees of $2,500 were incurred, together with inaccurate and double commissions for the estate (erroneously including the joint bank accounts) and the guardianship. The commissions aggregated $2,338.95, of which $1,298.61 were for commissions as executrix and $1,040.34 were for commissions as guardian.

Seven days before the daughter reached her 21st birthday, namely, on September 1, 1959, the joint bank accounts were transferred into the name of the aunt as testamentary guardian. Immediately after the daughter's birthday the assets in the decedent's estate were also transferred to the aunt as testamentary guardian. The transfer of the joint accounts was hardly necessary in view of the impending majority of the decedent's daughter. The transfer of the assets in the decedent's estate would seem to have even less justification since it occurred after the daughter's majority (see Surrogate's Ct. Act, § 179).

It was on November 9, 1959, two months after decedent's daughter reached majority, that she signed the waivers of citation in both accountings for her aunt and the aunt's lawyer. This

was done while she was alone with them in the lawyer's office. She avers that she was told that this was the proper procedure, that the lawyer was entitled to legal fees of $2,500, and that the aunt was entitled, by virtue of the statute, to the commissions both as executrix and as guardian. Decedent's daughter was also assured that the entire procedure was subject to approval by the court which would supervise the fixing of commissions and legal fees. She also says that shortly after her mother's death she was told by the lawyer that he would handle all the legal affairs, look out for her interests, and that she would receive the assets promptly after becoming 21.

Decedent's daughter waited three years before instituting proceedings. She explains this on the grounds of her innocence in legal matters, and reliance upon her aunt and the lawyer's advice. It was only after she had occasion to relate to others what had happened with her mother's assets that it was brought home to her that there may have been overreaching.

In this simple sequence there are some stark facts not adequately explained.

First, the joint bank accounts were erroneously included in decedent's estate; the executrix had no right or title to them (*Matter of Juedel,* 280 N. Y. 37; *Matter of Porianda,* 256 N. Y. 423; *Moskowitz* v. *Marrow,* 251 N. Y. 380; *Matter of Schwartz,* 30 Misc 2d 814; 3 Warren's Heaton, Surrogates' Courts, § 230, par. 8, subpar. [c]; 12 Carmody-Wait, N. Y. Practice, Surrogate's Practice, § 1223). Consequently, there was no right to impose executrix commissions based on the $26,000 of joint bank accounts, but only on the assets proper of the estate in the sum of $19,000.

Second, there was no apparent reason for shunting the assets from the estate into the guardianship after decedent's daughter had attained her majority. The only seeming purpose this could serve, in the absence of explanation, was to support double commissions.

Third, there is almost as much difficulty in understanding the earlier creation of a guardianship by transferring the joint bank accounts to the testamentary guardian. A delay of a few days would have permitted direct formal transcription of the accounts into the sole name of the joint survivor. Even this was not necessary, since decedent's daughter was a fully empowered joint owner. There has been no suggestion that the accounts were in any danger requiring the interposition of the guardianship for the seven-day interval.

Fourth, the difficulties are aggravated when the charges for legal services in the handling of this estate and guardianship

aggregate $2,500. The attempt to justify the fee by reference to Bar Association fee schedules is not impressive in view of the fact that even the application of schedules is not mechanical but requires discriminating judgment. Moreover, the application is even less impressive when the assets of both the decedent's estate and the guardianship are raised to their ultimate maximums only by the erroneous inclusion of the joint bank accounts and the doubtful transfers into the guardianship.

Respondents on the appeal make some argument about the right to double commissions and argue some issues of law with respect to that. Actually, it is not clear that there was a right to such double commissions on the $19,000 or any commissions on the $26,000 of joint bank accounts. They wholly fail to explain the seemingly contrived inflation of the decedent's estate. It is difficult to understand how a fiduciary obligation was being fulfilled in this case even if, as respondents contend, it were true that double commissions could sometimes be justifiably based on transfers from a general estate into a guardianship.

In the ordinary case involving no fiduciary obligations there might not be any relief from a decree entered on a waiver of citation in the absence of fraud in law or duress. The final decrees of the court, the signing of the waivers by a competent person, and the passage of time would separately or collectively suffice to prevent a reopening of the matter. In this case, however, there were fiduciary obligations and they were compound. There were the relationships of niece and aunt, of legatee and executrix, of ward and guardian, and of layman relying upon a lawyer's advice. In such case, the courts will grant relief against advantage taken and undue influence exerted by the fiduciary of the one who is a beneficiary or reposes confidence in the fiduciary. In *Fisher* v. *Bishop* (108 N. Y. 25) a leading case, a mortgage was cancelled because it was incurred through undue influence. A layman, respected in the community as legal adviser and conveyancer, had induced plaintiff to execute the mortgage by falsely telling him it was legally necessary in order to prevent a previous conveyance from being set aside as fraudulent against creditors.

The Court of Appeals quoted with approval from Pomeroy's Equity Jurisprudence (§ 951) : " ' Where an antecedent fiduciary relation exists, a court of equity will presume confidence placed and influence exerted; where there is no such fiduciary relation, the confidence and influence must be proved by satisfactory extrinsic evidence; the rules of equity and the remedies which it bestows are exactly the same in each of these two cases. The

doctrine of equity concerning undue influence is very broad, and is based upon principles of the highest morality. It reaches every case and grants relief where influence is acquired and abused, or where confidence is reposed and betrayed ' ''. (108 N. Y. 25, 28.) The court stated that the rule is not limited to cases of attorney and client, guardian and ward, trustee and *cestui que trust,* or other similar relations, but that it holds good " wherever fiduciary relations exist and there has been a confidence reposed which invests the person trusted with an advantage in treating with the person so confiding." (*Id.*) The court went on to say that when the relation of confidence is shown to exist the burden of proof is upon the person who benefits to show that the transaction is just and fair.

In this case, as already observed, the relationship qualifies under several of those referred to by the court. The rules referred to in the *Fisher* case still prevail and pervade in modern equity (e.g., *First Nat. Bank* v. *Wright,* 207 App. Div. 521, 526–528, affd. 240 N. Y. 559; *Dolan* v. *Cummings,* 116 App. Div. 787, affd. 193 N. Y. 638; 24 N. Y. Jur., Fraud and Deceit, §§ 61, 109, 278; 23 Am. Jur., Fraud and Deceit, §§ 14, 30, 31). The rule, of course, is applicable in Surrogate matters (e.g., *Matter of McGlone,* 258 App. Div. 596, 598–599, revd. on other grounds 284 N. Y. 527, affd. *sub nom. Irving Trust Co.* v. *Day,* 314 U. S. 556; 1 Warren's Heaton, Surrogates' Courts, § 121).

The vital and significant aspect of the rule is that representations, otherwise falling far short of sustaining actionable fraud or overreaching, made in the context of a fiduciary or confidential relationship, in which one party possesses superior knowledge, will more readily supply the basis for relief (e.g., *Fisher* v. *Bishop,* 108 N. Y. 25, 29, *supra; Matter of Hodgman,* 82 Hun 419, 423, app. dsmd. 145 N. Y. 637; *Matter of Frorup,* 10 Misc 2d 432, 435; 24 N. Y. Jur., Fraud and Deceit, §§ 17, 61, 109, 278; see *Allen* v. *La Vaud,* 213 N. Y. 322, 326–327; *Wood* v. *Rabe,* 96 N. Y. 414, 425–426; 25 N. Y. Jur., Guardian and Ward, §§ 144, 153, 154).

So too, where such fiduciary or confidential relationships are involved even misrepresentations of legal opinion, not otherwise actionable, may sustain an application for relief (e.g., *Hudson* v. *Glens Falls Ins. Co.,* 218 N. Y. 133, 138–139; *Haviland* v. *Willets,* 141 N. Y. 35, 50; *Berry* v. *American Cent. Ins. Co.,* 132 N. Y. 49, 54–55; *Fisher* v. *Bishop, supra; Matter of Cohen,* 18 Misc 2d 163, 165; *Tammero* v. *Tammero,* 125 N. Y. S. 2d 355 [HECHT, J.]). And, of course, the duty of a guardian continues even past majority of the ward as long as the ward was, in fact, dependent on the guardian and the influence of the guardian presumptively

or in fact continued (*Shiverick* v. *Bonsall,* 185 App. Div. 338, 343–344; *Gale* v. *Wells,* 12 Barb. 84, 95–97.*

These very same principles are utilized in reopening final decrees. The statutes provide that the Surrogate's Court has broad power to reopen final decrees where fraud, misrepresentation or other misconduct is shown (Surrogate's Ct. Act, § 20, subd. 6; CPLR, rule 5015, subd. [a], par. 3; see McKinney's Cons. Laws of N. Y., Book 7B, CPLR, rule 5015, comments p. 581). Thus, orders admitting wills to probate may be reopened under the principles outlined above (e.g., *Matter of Teller,* 277 App. Div. 937, revg. 196 Misc. 933, mot. for lv. to app. den. 277 App. Div. 1160).

Of the foregoing authorities, a case involving significantly parallel representations and relationships is *Matter of Hodgman* (82 Hun 419, app. dsmd. 145 N. Y. 637). There the court reopened an accounting decree. It was alleged that some of the legatee, heir, and next of kin petitioners were not represented at the accounting because they had been advised that such representation was unnecessary and that the Surrogate would protect their interests. Others claimed they were told by the executors that the estate was settled and that the amount they received

---

* Pomeroy sums up the situation and the applicable principles: "*Transactions after Termination of Relation.* The general doctrine of equity applies to the parties after the legal condition of guardianship has ended, and as long as the dependence on one side and influence on the other presumptively or in fact continue. This influence is presumed to last while the guardian's functions are to any extent still [un]performed, while the property is still at all under his control, and until the accounts have been finally settled. It follows, therefore, that any conveyance, purchase, sale, contract, and especially gift, by which the guardian derives a benefit, made after the termination of the legal relation, but while the influence lasts, is presumed to be invalid and voidable. The burden rests heavily upon the guardian to prove all the circumstances of knowledge, free consent, good faith, absence of influence, which alone can overcome the presumption.

"The rule applies with especial force to settlements by the guardian with his ward. The guardian must prove not only an absence of undue influence, and perfect fairness and good faith, but that the ward had full opportunity to examine the accounts, either by himself if he was able to understand them, or by the aid of some competent adviser or attorney.

"If the legal relation has ended, and all these circumstances of good faith, full knowledge, and free consent are clearly shown, a settlement, conveyance, contract, or even gift from the former ward to his recent guardian will be as valid and as effective as the same transactions between any other competent persons." (3 Pomeroy, Equity Jurisprudence [5th ed.], § 961a.)

(To similar effect, see 1 Story, Equity Jurisprudence [14th ed.], § 441; 25 N. Y. Jur., Guardian and Ward, *supra,* § 154; see, also, Restatement, Judgments, § 123, including *Illustration* 1; Restatement, Trusts 2d, §§ 217, 220 including *Comment a.*)

constituted all to which they were entitled. (Several petitioners, it is true, who had assigned all their interests in the estate, alleged that such instruments were procured from them by misrepresentation in that they thought they were merely signing receipts for money actually received by them. Two of the petitioners asserted that they could not read or write, and did not know what they were signing, except as was represented to them.) Finally, in the *Hodgman* case, as here, there were manifest wrongs in the conduct of the estate. Of particular interest is the court's general statement (p. 423) that "Matters then in the nature of a fraud, although not actually, perhaps, constituting a fraud in law, or which would be the basis of an action for fraud, yet matters of that character which have misled the petitioners, and by which they have been prejudiced, may be sufficient ground" to reopen the decree.

For cases closely analogous to this in other jurisdictions, involving post-majority transactions between guardian and ward and reopening of decrees, see *Willis* v. *Rice,* 157 Ala. 252; *Moore, Appellant,* 112 Me. 119; *Klemp* v. *Winter,* 23 Kan. 699.

Consequently, without more, respondents may not rely only on the waivers of citation signed by decedent's daughter within two months of attaining her majority. Under the circumstances and under the rule they may have at least a duty to explain.

Accordingly, the orders of the Surrogate denying the motions to vacate the decree should be reversed on the law, the facts, and in the exercise of discretion, with costs to abide the event, to the extent of remanding the proceedings to the Surrogate to take proof in accordance with the views expressed herein.

RABIN, EAGER, STEUER and BASTOW, JJ., concur.

Orders, entered on May 23, 1963, denying the motions to vacate the decree, unanimously reversed, on the law, the facts, and in the exercise of discretion, with costs to abide the event, to the extent of remanding the proceedings to the Surrogate to take proof in accordance with the views expressed in the opinion of this court filed herein.