In the Matter of the Estate of CHARLES T. HARBECK, Deceased.*

Surrogate's Court, Kings County, November 25, 1931.

* See, also, 142 Misc. 556.

*Hunt, Hill & Betts,* for the petitioner.

*Franklin W. Morrell,* for the respondents.

*Walter A. Peterson,* for Charles Harbeck.

WINGATE, S. Charles H. Harbeck died on the 20th of January, 1894, a resident of the borough of Manhattan, New York city. On the eighth of the following March his will and codicil were admitted to probate by the surrogate of New York county, and letters testamentary issued to the executors named therein, who were his son, Charles T. Harbeck, and Alfred S. Brown. So far as is presently material, testator erected a trust of $55,000 for the life of his son, with remainder over to such of the latter's children as he might by will appoint. This direction was contained in the 14th item of the will as amended by the 5th item of the codicil. The trustees of this trust were the executors, " or such of them as shall qualify and * * * the survivors or survivor of them." The directions respecting investment read as follows: " They shall as soon as practicable after my decease loan out or invest the same in first class railroad bonds or stock or any such other securities or property as they in their best judgment shall deem proper."

On April 16, 1895, the executors filed their account with the surrogate of New York county and it was judicially settled. Among other payments shown by the account was one of the principal fund of the trust amounting to $55,000 to Charles T. Harbeck, as trustee. On May 23, 1895, Charles T. Harbeck alone qualified as trustee.

As a result, upon the happening of these events, Charles T. Harbeck, testator's son, became the sole trustee and life tenant of the trust and had in his hands the sum of $55,000, constituting its principal.

The chronological sequence of events may, for the moment, be disregarded in order to note that the life tenant and trustee died on January 19, 1929, leaving a will which was admitted to probate in this court on June 24, 1929. By the 5th item of this document he exercised in favor of his son, Dr. Charles Harbeck, the power of appointment given him by the will of his father, Charles H. Harbeck, respecting the remainder of the trust.

In view of the familiar principle that a testamentary document exercising a power of appointment given by a prior will is to be read into the testamentary instrument of the donor (*Matter of Terwilligar,* 135 Misc. 170, 174, 176; affd., 230 App. Div. 763; *Matter of Davison,* 137 Misc. 852, 858; *Matter of Mann,* 138 id. 42, 46; *Matter of Wickham,* 139 id. 729, 731), it follows that for the purpose of the principal determination here necessary, the situation is precisely the same as if the original testator, Charles

H. Harbeck, had named Charles T. Harbeck, his son, as the life tenant of the trust and had himself directed the payment of the remainder to his grandson, Dr. Charles Harbeck.

Charles T. Harbeck, the life tenant trustee, married Helen Tierney in or about the year 1919. Prior to such marriage he entered into an antenuptial agreement with her, dated the eleventh of January in that year. By the terms of this agreement he covenanted to hold certain specified properties in trust for her, and to pay her the income thereof during her life, the principal on her death to go to certain other persons not here material. On her part Miss Tierney covenanted that the settlement thereby made should be in " lieu and satisfaction of all dower, right and claim of dower and every other right, title and interest which " she " may or can at any time have in, to or upon the estate of " Mr. Harbeck, " whether real or personal," it being further provided that if Miss Tierney should survive Mr. Harbeck, she " shall not be entitled to any share or portion of the personal property which " he " is now or hereafter may be possessed of or entitled to."

This agreement was apparently several times amended. The last pertinent amendment, which will hereafter be noted, was made under date of June 29, 1926.

In the spring of 1926 Charles T. Harbeck controlled by total ownership of stock a certain New York corporation known as the Islip Corporation. This company in turn was the owner of a tract of land comprising approximately fifty-four acres in the town of Islip, Suffolk county, N. Y. This property was entirely unimproved and was in part meadow land. Under date of March 12, 1926, the Islip Corporation entered into a contract for the sale of this tract to one James L. Meeks at a price of $2,000 per acre, payable $10,000 in cash on the execution of the agreement, $25,000 on the delivery of the deed, and the balance by first mortgage on the property itself. Meeks caused a corporation to be organized for the purpose of taking title to this property and completing the contract, and on June 24, 1926, the sale was consummated, the closing figures, however, being as of the law day, which was May twelfth. The purchase price was $109,070, plus interest for delay in closing, aggregating $168.34, making a total of $109,238.34. This sum was paid by the $10,000 deposit on the signing of the contract, $5,000 on June 16, 1926, $19,238.34 at the time of closing, and by the giving of a purchase-money bond and mortgage in the sum of $75,000, executed by Valdosta Realty Corporation, maturing on May 12, 1931, bearing interest at six per cent. The obligee in the bond and mortgagee in the mortgage were the Islip Corporation. By instrument dated June 29, 1926, the Islip Corporation

assigned this mortgage to Charles T. Harbeck individually, the assignment being recorded in the county clerk's office of Suffolk county on July seventh. Substantially simultaneously therewith, Charles T. Harbeck executed two instruments both bearing date June 29, 1926. The first was a declaration of trust, which, after reciting the assignment of the Valdosta bond and mortgage to Charles T. Harbeck, read as follows: " I, the said Charles T. Harbeck, do hereby certify and acknowledge and declare that I hold said assignment and said bond and mortgage, and shall and will hold all moneys received on account of the amount secured by said bond and mortgage, as follows:

" (1) Fifty-five thousand dollars thereof, and the interest thereon, for account of and for the use and benefit of Charles T. Harbeck, as trustee for Charles T. Harbeck under the last will and testament of Charles H. Harbeck, deceased, said sum constituting the principal of the trust fund of Fifty-five thousand dollars created by said last will and testament; and

" (2) The balance thereof, subject and subordinate to the prior claim' of Fifty-five thousand dollars and interest above mentioned, for account of and pursuant to a certain ante-nuptial agreement made between myself and Helen Tierney (now Helen Tierney Harbeck), dated January 11th, 1919, as modified by an agreement made between myself and said Helen Tierney Harbeck, bearing even date herewith, and in pursuance of the provisions of said last mentioned agreement bearing even date herewith."

This instrument was apparently never recorded anywhere.

The second document, dated June 29, 1926, was a modification of the antenuptial settlement agreement. This was executed both by Charles T. Harbeck and by Helen Tierney Harbeck, his wife. This instrument, after reciting the making of the antenuptial agreement and the reserved power of amendment therein contained, annulled various covenants in the original antenuptial agreement for the holding in trust by Charles T. Harbeck of various properties enumerated in such original agreement and amendments thereto, and provided, in its 4th paragraph, that in lieu of the previous trust properties, Charles T. Harbeck should hold as trustee for the benefit of Helen Tierney Harbeck a portion of the $75,000 bond and mortgage assigned by the Islip Corporation, it being expressly stated that he should hold this bond and mortgage as to $55,000 of the principal thereof, pursuant to the testamentary trust under the will of Charles H. Harbeck and the balance of principal in trust for Helen Tierney Harbeck.. Mr. Harbeck further covenanted to pay Mrs. Harbeck from time to time during

her life the interest received by him on her beneficial moiety in this mortgage.

The 5th paragraph of this agreement again expressly revoked provisions of the original antenuptial settlement and of the two subsequent amending agreements in respect to all assets therein enumerated, continuing, " and the only property held in trust by the party hereto of the first part for the benefit of the party hereto of the second part, under said agreements, or any of them, is said bond and mortgage for Seventy-five thousand dollars hereinbefore mentioned, subject and subordinate to said prior interest therein of Fifty-five thousand dollars and interest as hereinbefore set forth," which as noted was stated to be held by him pursuant to the testamentary trust of Charles H. Harbeck.

The 7th and 8th paragraphs of this agreement in terms ratified and confirmed all provisions of the original antenuptial agreement except as expressly altered therein.

The Valdosta Realty Corporation regularly paid the interest on the $75,000 bond and mortgage up to the time of the death of Charles T. Harbeck. It has been made to appear, however, that the portions of such interest payable by Charles T. Harbeck to Mrs. Harbeck pursuant to the amended antenuptial agreement from the interest received by him on November 12, 1926, May and November 12, 1927, and May 12, 1928, were retained by him and not paid over to her. Subsequent to Mr. Harbeck's death the Valdosta Company defaulted in payment of interest and in communications addressed to his executors stated their inability to comply with the terms of the mortgage, due to changed conditions, and offered, in order to save the expense of foreclosure proceedings, to redeem the property in satisfaction of the mortgage.

It is conceded by all parties that the Valdosta Company has no assets other than the property in question; in consequence of which a deficiency judgment against it would be valueless.

Expert testimony adduced on the hearing indicates that the present market value of the property probably does not greatly exceed $600 per acre, or a total value for the entire mortgaged tract of approximately $32,000.

Charles T. Harbeck died on January 19, 1929, his will being admitted to probate in this court on June twenty-fourth following. Subsequent to his death, Alfred S. Brown, who was named and acted as his coexecutor under the will of Charles H. Harbeck in New York county, there qualified as trustee of the $55,000 trust erected by the will of Charles H. Harbeck. On January 27, 1930, Dr. Charles Harbeck, the remainderman of the trust under the will of Charles H. Harbeck, filed with the executors of Charles T. Har-

beck a claim for any deficiency which might arise as a result of the inadequacy of the Valdosta mortgage to make good the entire $55,000 principal of his trust. On June 17, 1930, he petitioned the surrogate of New York county for an order directing the substituted trustee to account. Surrogate FOLEY rendered a decision which appeared in the issue of the *New York Law Journal* for August 16, 1930. The chief question therein decided seems to have been the propriety of compelling the substituted trustee to take a conveyance of the Islip property for the purpose of attempting to work out the principal fund of the trust. In his opinion Surrogate FOLEY stated in part as follows: " in view of the fact that the estate of the deceased trustee is pending in the Surrogate's Court of Kings county, the substituted trustee may be directed to proceed forthwith to compel the filing of an account by the executors of the deceased trustee in that court. The question as to whether real estate should be received by these executors is a matter for their discretion subject to the control of the Surrogate of Kings County. It would appear that the more orderly procedure would be to resort " to this procedure " since the general accounting could be had in Kings County and the rights of the individual beneficiaries, of creditors and of the beneficiary of the subordinate trust created by the declaration of trust could be completely adjudicated. In view of these facts the following directions will be made: (1) The substituted trustee is directed to file an account within thirty days. (2) The substituted trustee is directed to proceed forthwith to take the necessary legal steps to compel the delivery or payment of the corpus of the trust fund — $55,000 to him. (3) If the petitioner elects to proceed in this court rather than through the substituted trustee in the Surrogate's Court of Kings County, an accounting pursuant to section 257 will be directed to be filed within the thirty days by the executors of the deceased trustee for the acts and doings of the decedent in this estate and for the trust property which came into their possession or in the possession of the deceased trustee."

In view of the fact that Alfred S. Brown, the substituted trustee, was also one of the executors of Charles T. Harbeck, it was arranged that he should resign in the former capacity, and on November 11, 1930, the surrogate of New York county made a decree appointing Enos T. Geer as successor trustee in his place.

On February 6, 1931, Mr. Geer presented a petition to this court in his capacity as successor trustee of the trust created under the will of Charles H. Harbeck, for a compulsory accounting by the executors of Charles T. Harbeck for the acts of the latter as trustee of the trust. This petition was entertained, and on July 15, 1931,

---

* 142 Misc. 556.

an order was made by this court directing a compulsory accounting by the executors. On September tenth the executors petitioned for a voluntary accounting and the two proceedings were consolidated. Their account was filed on September twenty-fourth and various objections thereto were interposed both by the successor trustee and by Dr. Charles Harbeck, upon which a hearing has been had before the court and which are now presented for determination.

It has not been seriously contended before the court that the action of Charles T. Harbeck in appropriating the principal of the $55,000 trust fund in return for his declaration of trust in a part of the Valdosta mortgage, did not amount to a devastavit. Indeed, the mere recital of the facts hereinbefore noted would make any such position border upon the ridiculous. The direction for investment contained in the will was that the funds should be loaned or invested " in first class railroad bonds or stock or any such other securities or property " as the trustees deem wise. In view of the fundamental rule of policy respecting trust investments enunciated as early as 1869 in the leading case of *King* v. *Talbot* (40 N. Y. 76), the burden is cast upon any person claiming authority to make other than legal investments to clearly demonstrate that such was the testator's intention. (*Matter of Robbins*, 135 Misc. 220, and cases cited.)

It is far from clear that any authorization is given in this will beyond " first class railroad bonds or stock," since the addition of the words " such other securities or property " would, on ordinary principles of construction, be interpreted in accordance with the principle of *noscitur a sociis*, with the result that such discretionary power as was granted to the trustees extended only to other first-class investments of a legal or semi-legal nature.

Granting, however, that some discretionary power beyond this point was granted to the trustees by the testator, the principle noted in *Matter of Wilkin* (183 N. Y. 104, 113) applies. In that case the Court of Appeals held that " the discretion of the trustee was not absolute, but it was a sound discretion, to be exercised according to her best judgment and in the best of faith, which is always true of such authority, unless stated in terms to be otherwise." The gross improvidence of the action here taken is obvious. In the first place, the entire fund was invested in a single security, which, in view of its not inconsiderable size, was a matter of questionable wisdom. In view of the fact that the mortgagor and obligor on the bond had no resources whatsoever beyond the unimproved property conveyed, the bond itself, divorced from the mortgage, had absolutely no value. Finally, the mortgage itself was on totally unimproved property and amounted to almost

seventy per cent of the value of such property even when computed on the basis of the extremely inflated purchase price. The evidence adduced before the court makes it appear expressly probable that on a fair valuation as of the date of the transaction the face of the bond and mortgage exceeded by a considerable sum the entire worth of the property on which it was secured.

Subdivision 6 of section 239 of the Banking Law, which regulates trust investments, and which formed a part of chapter 369 of the Laws of 1914 (as amd. by Laws of 1927, chap. 323), reads: "If the loan is on unimproved and unproductive real property, the amount loaned thereon shall not be more than forty per centum of its appraised value."

It is obvious, therefore, that the attempts of the accountants herein to minimize the extent of the devastavit are idle, and that the whole transaction was grossly improvident, if not positively criminal.

Further and beyond all this, however, the trustee committed a most serious breach of trust in purchasing this security from himself. It is an axiom both of fact and ethics that a man cannot serve two masters. As has been noted, the property, prior to its sale, actually belonged to the trustee himself in his individual capacity, although title thereto stood in the name of a dummy corporation, which he absolutely controlled through total stock ownership. Disregarding, however, this phase of the matter, the mortgage, at the time of its purported dedication to this trust, was actually the individual property of the trustee by reason of its assignment to him. Indeed this record title has never been altered. Even if it be granted, therefore, that he acted in good faith in his dealings with the trust, which in itself is by no means obvious, his action was in violation of the fundamental principle of public policy noted in *Matter of Long Island Loan & Trust Co.* (92 App. Div. 1, at p. 4): "Trustees cannot be permitted to deal with trust funds in the dual capacity of buyer and seller. It has long been settled, and upon principles which cannot be controverted, that a trustee cannot deal in his own behalf with the funds intrusted to his charge for the benefit of another. He can neither purchase the trust funds for himself, nor exchange them for his own property. (*Ackerman* v. *Emott*, 4 Barb. 626, 649; *Smith* v. *Howlett*, 29 App. Div. 182.)"

Finally, this trustee committed a serious breach of the law, amounting to a misdemeanor, by carrying the property of the trust in his own name and commingling the funds of the testamentary trust with those of the trust for his wife under the antenuptial

agreement. The pertinent provision of the law in this connection was added by chapter 588 of the Laws of 1916, in the form of section 2664-a of the Code of Civil Procedure, and has been continued in the Surrogate's Court Act in section 231 which reads as follows:

" Funds of estates to be kept separate.

" Every executor, administrator, guardian or testamentary trustee shall keep the funds and property received from the estate of any deceased person separate and distinct from his own personal fund and property. He shall not invest the same or deposit the same with any person, association or corporation doing business under the banking law or other person or institution, in his own name, but all transactions had and done by him shall be in his name as such executor, administrator, guardian or testamentary trustee.

"Any person violating any of the provisions of this section shall be guilty of a misdemeanor."

That such was the rule of law even prior to its statutory enactment is indicated by the language of Surrogate FOLEY in *Matter of Early* (112 Misc. 54, at p. 60; affd., 195 App. Div. 889).

From these considerations it follows that since the action of the trustee constituted a wholly unwarranted dealing with the principal fund of the trust, it is the privilege of the remainderman, or the successor trustee, to disaffirm the transaction and hold the deceased trustee or his estate liable for the full amount of the principal fund of the trust. Furthermore, since it is obvious that the funds of this trust were invested in the Valdosta mortgage, which fact the deceased trustee and his executors are estopped to deny, the successor trustee, on behalf of the remainderman, is entitled, in addition to his right of recovery against the trustee and his estate, to an equitable lien on the particular item of property in which the funds of the trust were placed. An early and particularly interesting affirmation of this general doctrine is found in *Hooley* v. *Gieve*, which is reported in convenient form in 9 Abbott's New Cases, beginning at page 8, where the opinions of the two hearings at Common Pleas, the two hearings at General Term and the one in the Court of Appeals are given consecutively. The Court of Appeals result is reported by memorandum only in 82 New York, 625. The portions of the opinions given in the 9th volume of Abbott's New Cases on pages 21, 23, 24, 27, 29 and 30, are of particular interest.

Similar applications and statements of the equitable principle involved may be found in *Storm* v. *McGrover* (189 N. Y. 568, 569); *Newton* v. *Porter* (69 id. 133, 137); *Day* v. *Roth* (18 id. 448, 455, 456); *Perry* v. *Board of Missions* (102 id. 99, 104); *Hale* v. *Omaha*

*National Bank* (49 id. 626, 634, 635); *Price* v. *Palmer*, (23 Hun, 504, 506); *Matter of Holmes* (37 App. Div. 15; affd., 159 N. Y. 532); *Ostrander* v. *Ostrander* (194 App. Div. 1, 8); *Klinzing* v. *Blauw Bros., Inc.* (160 N. Y. Supp. 631, 635, not officially reported); *Bushe* v. *Wright* (118 App. Div. 320, 328); *Matter of Early* (112 Misc. 54, 61, 62; affd., 195 App. Div. 889).

As noted in *Perry* v. *Board of Missions* (*supra*, at p. 106), " the usual course of enforcing an equitable lien is by a sale of the property to which it is attached, and we find nothing in this case to take it out of the general rule." (See, also, *Price* v. *Palmer, supra,* at p. 507.)

In view of the basic nature of the claim against the deceased trustee and his estate for the devastavit, it is obvious on the authorities cited, that in the event the particular security, namely, the Valdosta mortgage, is insufficient to make good the $55,000 principal fund of the trust with interest at six per cent for the period during which such interest has remained unpaid, namely, since November 12, 1928, any deficiency becomes a general claim against the deceased trustee and his estate. In this connection, however, the successor trustee is remitted to a position of parity with other claimants against the estate and is, therefore, postponed to funeral and administration expenses, which are preferred by statute. (*Matter of Smallman,* 138 Misc. 889, 893, and cases cited.)

So far as the court is able to determine from the record, the only other unpaid claimant is Mrs. Helen T. Harbeck. The court is satisfied from the proofs adduced that she is entitled to receive payment of the $2,400 trust interest withheld by Charles T. Harbeck and her claim in this regard, therefore, ranks on a parity with the claim of the successor trustee under the testamentary trust, except for the fact that the latter, by reason of the equitable lien upon the Valdosta mortgage, is entitled to a preference to the extent of the value thereof. Were it not for the fact that the amendment to the antenuptial agreement in express terms postponed the rights in the Valdosta mortgage thereunder to those of the testamentary trust, her claim would, in all respects, be *pari passu* with that of the successor trustee. In this connection, however, on familiar principles of marshaling, the recovery of the successor trustee will be payable primarily from the general body of the estate in exoneration of the proceeds of the Valdosta mortgage, in order, if possible, to preserve something for the widow on principal account from the latter.

Some emphasis has been placed by the accountants on the alleged election of remedies claimed to have taken place by reason of the application of Dr. Charles Harbeck in New York county

to compel the executors to transfer the property at Islip to the substituted trustee for realization.

It is entirely apparent that so long as the trust exists no direct rights of recovery for the devastavit belong to the *cestui que trust*. All are vested in the trustee. (*Bushe* v. *Wright*, 118 App. Div. 320, 332; *Matter of Meehan*, 104 Misc. 219.) The executors, in further attempting to advance their election theory,. contend that on the death of the life tenant of the testamentary trust, title to the property vested in the remainderman and that consequently the appointment of a successor trustee was unnecessary. This in effect amounts to a collateral attack upon the decree of the surrogate of New York county appointing such successor trustee which course, on primary principles, is not permissible. On the merits, however, it seems entirely apparent under the particular facts of this case, that the appointment of a successor trustee was necessary. (*Matter of Thomas*, 254 N. Y. 292.)

However, even if the action of the beneficiary could be considered binding upon the successor trustee in this connection, it is entirely apparent that the New York proceeding having proved abortive, its institution would not be considered to constitute an election of remedy. (*Schenck* v. *State Line Telephone Company*, 238 N. Y. 308, 311; *Clark* v. *Kirby*, 243 id. 295, 303.) In any case, the principle of election will be applied very sparingly by a court of equity when it involves, as it here would, a partial escape of a wrongdoer from the penalty for his egregious malfeasance in office.

The objections of Dr. Charles Harbeck numbered 1, 5, 6, 7, 8, 10 and 11 have been fully dealt with *supra*. His objection No. 2 is overruled. The counsel fees charged for the conduct of this estate are reasonable in amount. The proportion thereof apportionable to services in the New York county proceeding is a relatively small item and it is entirely apparent from the result there attained that it was proper for the executors to be represented by counsel therein.

Objection No. 3 is also overruled, since the action of the executors in paying the taxes on the Islip property was essential for the preservation of the estate and particularly of that portion thereof on which this objecting party has an equitable lien. He was directly benefited by this payment.

Objection No. 4, so far as it relates to the sale of the Brooklyn avenue property, has been withdrawn. The other objections are sustained. It is the duty of the executors to liquidate the estate promptly and they should proceed to sell these additional properties forthwith.

Objection No. 9 is also sustained. In view of the fact that the

action of the deceased trustee not only constituted a devastavit of the estate, but that certain of his actions in dealing therewith amounted to positive criminal offenses, the court should exercise its discretion against allowance of any commissions to him in connection with his conduct of the trust.

Costs and disbursements in this proceeding will be allowed to the successor trustee and to Dr. Charles Harbeck, payable from the estate.

Proceed accordingly.